1  Bradley A. Patterson, Esq. (Cal. Bar No. 155482)
   E-Mail: bapatterson@lgilaw.com
2  LGI LLP
   LAWYERS GROUP INTERNATIONAL
3  18101 Von Karman Ave., Suite 330
   Irvine, CA 92612-0146
4  Telephone: (949) 253-0500
   Facsimile: (949) 253-0505
5
   Attorneys for Plaintiff David B. Greenberg
6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  DAVID B. GREENBERG,                    ) Case No.  CV09-5273 RSWL(RCx)
    an individual,                         )
12                                         )
                            Plaintiff,     ) **CIVIL COMPLAINT FOR:**
13  vs.                                    )
                                           ) 1.  **INDEMNITY UNDER**
14  KPMG LLP,                              )     **CALIFORNIA LABOR CODE**
    a Delaware limited liability partnership, )  **§ 2802;**
15                                         )
                            Defendant.     ) 2.  **INDEMNITY UNDER**
16  _____)     **6 DELAWARE CODE**
                                                 **§ 15-401(c);**
17
                                             3.  **INDEMNITY UNDER**
18                                               **6 DELAWARE CODE**
                                                 **§ 15-701(d);**
19
                                             4.  **BREACH OF IMPLIED**
20                                               **CONTRACT FOR**
                                                 **INDEMNITY;**
21
                                             5.  **BREACH OF THE**
22                                               **COVENANT OF GOOD FAITH**
                                                 **AND FAIR DEALING;**
23
                                             6.  **BREACH OF FIDUCIARY**
24                                               **DUTY;**

25                                           7.  **MALICIOUS PROSECUTION;**

26                                           8.  **DEFAMATION;**

**9. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**

**10. FRAUD; AND**

**11. DECLARATORY RELIEF**

[*DEMAND FOR TRIAL BY JURY*]

Plaintiff David B. Greenberg alleges:

## JURISDICTION

1. This Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) in that more than $75,000.00 is at issue in this action, exclusive of interest and costs, and there is diversity of State citizenship between Plaintiff, on the one hand, and Defendant, on the other hand.

## VENUE

2. The claims set forth in this Complaint arise from and/or are related to Plaintiff's prior employment with Defendant in the County of Los Angeles, State of California.

## PARTIES

3. Plaintiff David B. Greenberg ("Greenberg") is an individual resident in the County of Palm Beach, State of Florida.

4. Defendant KPMG LLP ("KPMG")  is a limited liability partnership organized and existing under the laws of the State of Delaware with its principal place of business in the City of New York, State of New York.  KPMG is one of the Big Four accounting firms and maintains offices in, and regularly conducts significant business operations in, this judicial district.

1

**FACTUAL BACKGROUND**

2    5.    Greenberg earned a Masters Degree in Accounting and was at all

3   times relevant herein qualified in the State of California as a Certified Public

4   Accountant.

5    6.    Greenberg first joined KPMG in 1989 and voluntarily left the firm

6   in 1994 to pursue other endeavors.

7    7.    Greenberg rejoined KPMG in its Los Angeles, California, office in the

8   Spring of 1999.  KPMG categorized Greenberg as a "Senior Manager" until the

9   management committee met several weeks later and re-categorized Greenberg as a

10  "Class B Partner."

11   8.    Although nominally titled by KPMG as a "partner," the facts of the

12  relationship under California law reveal that the relationship between KPMG and

13  Greenberg was actually that of an employer and employee:

14      A.    Greenberg held no ownership interest in KPMG;

15      B.    Greenberg had no voice in the management of KPMG;

16      C.    KPMG had almost 1,800 "partners"; however, responsibility for

17  management of the firm was left solely to a Management Committee and a Board

18  of Directors;

19      D.    Greenberg was never a member of KPMG's Management

20  Committee or the Board of Directors;

21      E.    Instead of being treated as an owner of the firm, as would be the

22  case in a traditional partnership, Greenberg's performance was reviewed by

23  superiors in KPMG and he was subjected to bi-annual performance reviews by his

24  Performance Manager;

25  / / /

26  / / /

1           F.      Greenberg was not free to choose the type of work that he

2  performed at KPMG–instead, Greenberg was assigned his work duties by KPMG

3  management;

4           G.      Greenberg did not receive as his compensation a percentage of

5  KPMG's profits based on his percentage of ownership interest in the firm, as

6  would the case in a traditional partnership; instead, Greenberg was compensated

7  based on his personal productivity;

8           H.      Greenberg had no vote on compensation levels within the

9  KPMG "partnership";

10           I.      Greenberg did not have the power to vote on proposed

11  admittees to the "partnership", a power which resided in the KPMG Board of

12  Directors;

13           J.      Greenberg did not have the power to vote on the termination of

14  KPMG "partners" from the firm;

15           K.      Greenberg did not have the power to hire or fire other

16  employees at KPMG; and

17           L.      Greenberg's employment could be terminated at will by KPMG

18  without a vote of its "partners".

19      9.      Greenberg is informed and believes and thereon alleges that KPMG

20  chose to categorize him, and other "partners" similarly situated, as "partners"

21  rather than employees in an improper effort to avoid California and other state and

22  Federal statutory protections for employees and to avoid paying the employer paid

23  portion of Federal and California State payroll taxes.

24      10.     Against his expressly stated desires, Greenberg was assigned to work

25  in the Stratecon practice group in KPMG's Los Angeles office.

26  / / /

1    11.    KPMG assigned the Stratecon practice group the task of devising and

2    marketing tax products to high net worth corporate clients.

3    12.    The pervasive firm culture at KPMG was to maximize its profits.  In

4    the tax division, which was one of the three major divisions within KPMG, a

5    significant focus was placed on devising and marketing aggressive tax avoidance

6    strategies.

7    13.    KPMG as a whole, from its Board of Directors and Management

8    Committee on down, was aware that the tax avoidance strategies were extremely

9    profitable for the amount of work that was necessary and specifically approved of

10   the marketing of those tax avoidance strategies.  For example, the official KPMG

11   training manual included a section on devising an abusive real estate tax shelter for

12   a fictional company referred to as "Bronson Realty, Inc."

13   14.    Tax shelter work was an integral part of KPMG and the services that it

14   provided to its clients.

15   15.    Greenberg is informed and believes and thereon alleges that many of

16   KPMG's largest clients, including Citibank, Fannie May, New Century, RGI,

17   Occidental Petroleum, Ryder International, AIG, Goldman Sachs and its mutual

18   funds, Berkshire Hathaway, Bank of America, Worldcom, Washington Mutual,

19   and Countrywide Financial, participated in, and will testify in this action that they

20   participated in, abusive tax shelters created and marketed by KPMG.

21   / / /

22   / / /

23

24

25

26

16.     Greenberg was informed that the tax products with which Greenberg was involved at KPMG were approved at the highest levels of KPMG management.  Greenberg was informed that, within KPMG, the Washington National Tax office ("WNT") and KPMG's Department of Professional Practice ("DPP"), which is KPMG's professional oversight office, approved all of the tax products that were devised and marketed by KPMG and were well aware of the tax investment strategies in which Greenberg was involved.

17.     Greenberg relied on the representations and conclusions of KPMG management, the expert KPMG tax personnel above him, WNT, and DPP, and Greenberg also independently believed, that all tax products in which Greenberg was involved were lawful and were "more likely than not" to be ultimately upheld as lawful tax strategies.

18.     Greenberg later learned after he had ceased issuing tax strategy opinions for KPMG there had been some differences of opinion voiced within KPMG concerning the viability of the tax shelters being marketed by KPMG–although that information had been concealed from Greenberg–however, Greenberg is informed and believes that the majority of experts at KPMG who reviewed the tax products nevertheless concluded that they were "more likely than not" to be upheld as lawful tax strategies.

19.     In 2002 the Internal Revenue Service ("IRS") began issuing summonses to KPMG in an investigation into the marketing of abusive tax shelters.

20.     Greenberg is informed and believes and thereon alleges that, in or about 2002, Mike Hamersley was a senior manager in KPMG's office in Los Angeles.

/ / /

21.     Greenberg is informed and believes and thereon alleges that Mr. Hamersley had been actively involved in promoting illegal abusive tax shelters at KPMG.

22.     Greenberg is informed and believes and thereon alleges that, in early 2002, having learned that the IRS had commenced its investigation of abusive tax shelters, Mr. Hamersley commenced a deliberate course of conduct to distract attention from the tax shelter work in which he had been engaged.

23.     Greenberg is informed and believes and thereon alleges that Mr. Hamersley was also unhappy that he had not been named a partner in KPMG and that he partially blamed Greenberg for not being admitted to the KPMG partnership.

24.     Greenberg is informed and believes and thereon alleges that, in order to advance his agenda, Mr. Hamersley falsely reported to KPMG management that Greenberg was engaged in marketing illegal abusive tax shelters.

25.     Greenberg is informed and believes and thereon alleges that, as a result of Mr. Hamersley's false and vindictive allegations to KPMG management, in June, 2002, KPMG initiated a six-month long investigation of Greenberg.  The investigation included a detailed search of Greenberg's background and having private investigators follow Greenberg and his family.

26.     While the KPMG investigation of Greenberg was underway, Greenberg was ordered by KPMG not to work on any client matters; however, Greenberg's supervisors in the Los Angeles office nevertheless requested that Greenberg continue writing tax opinions for existing clients.  Greenberg, however, refused to do so.

27.     The investigation was completed in December, 2002, and Greenberg was informed by KPMG that it had been concluded satisfactorily in his favor.

28.     Disgusted with the manner in which he had been treated in connection with the KPMG investigation, Greenberg tendered his resignation to KPMG in February 2003.

29.     Once Greenberg tendered his resignation, severance discussions commenced between Greenberg and KPMG.  Those discussions were satisfactorily concluded and Greenberg's resignation from KPMG became effective on August 31, 2003.

30.     A written settlement agreement was entered into by and between KPMG and Greenberg on or about September 5, 2003, in connection with Greenberg's departure from KPMG.  In that agreement, KPMG waived any and all claims–known and unknown–that it might have against Greenberg for acts and omissions committed by Greenberg prior to entry into the agreement.

31.     Greenberg is informed and believes and thereon alleges that Claudia Taft is an individual employed as a partner of KPMG in its office located in New York, New York.  Ms. Taft was responsible for negotiating the severance agreement between KPMG and Greenberg.  During those negotiations, Ms. Taft failed to inform Greenberg of the IRS investigation, even though Ms. Taft was aware of that investigation.

32.     Had Greenberg been informed of the IRS investigation, he would have demanded that KPMG expressly agree to defend and indemnify him in connection with the investigation and any related actions.  Because that information was wrongfully withheld from Greenberg, however, the severance agreement is silent on the issue.

33.     Later in 2003, the United States Senate commenced its investigation into the tax shelter industry.

/ / /

- 8 -

34.     Mr. Hamersley self-servingly presented himself as a "whistle-blower" and testified before a United States Senate Committee in October, 2003, that KPMG was devising and promoting abusive tax shelters.  In connection with his testimony, Mr. Hamersley unlawfully disclosed confidential taxpayer information concerning certain tax shelter participant clients of KPMG, including a client whose initials are "L.L." and corporate clients Adidas and Occidental Petroleum.

35.     Mr. Hamersley testified before the Senate that he avoided "direct involvement" in KPMG's abusive tax shelters, which he defined for the Senate as transactions which were "merely 'window dressed' with a contrived facade of economic substance", which involved "concealment of facts", and which sometimes used "attorneys as conduits to facilitate fact concealment".

36.     Mr. Hamersley's testimony was false.  Greenberg is informed and believes and thereon alleges that Mr. Hamersley was in fact directly involved in transactions which were "abusive tax shelters" under his definition of the phrase.

37.     Greenberg is informed and believes and thereon alleges that Mr. Hamersley worked on a client matter at KPMG referred to as "the RGI client transaction."

38.     Greenberg is informed and believes and thereon alleges that the RGI client transaction intentionally concealed from the IRS the true facts of the abusive tax shelter approved by Mr. Hamersley and used the client's lawyer as a conduit for the fraud.

39.     Greenberg is informed and believes and thereon alleges that the RGI client transaction used offshore tax haven companies and generated tens of millions of dollars in illusory tax losses based on the fraudulent sale of stock of one of the foreign tax haven companies to the client's lawyer for the claimed *de minimus* sum of one dollar.

40.     Greenberg is informed and believes and thereon alleges that Mr. Hamersley recommended that RGI unlawfully backdate documents by purporting to have signed the documents on a certain date, when in reality the documents were not signed until approximately a year later.  These were not documents which memorialized earlier oral agreements, but rather were documents that memorialized agreements which had been made after the underlying factual events had occurred.

41.     Greenberg is informed and believes and thereon alleges Mr. Hamersley was also involved in another abusive tax shelter at KPMG that Hamersley referred to as a "Double Dip Financial Structure" for client contract number 10580470, which involved taking the same tax loss twice.

42.     Mr. Hamersley also lied to the government in an effort to implicate Greenberg.  Greenberg is informed and believes and thereon alleges that Mr. Hamersley had reviewed and approved a tax strategy devised for a KPMG client whose initials are "L.L.".  Greenberg is informed and believes and thereon alleges that Mr. Hamersley, however, misrepresented to the government that Greenberg had sold an illegal tax shelter to L.L., even though Mr. Hamersley knew that the client had realized a substantial profit on the investment portion of the tax strategy and that the client had never actually claimed the potential tax benefits of the strategy.

43.     KPMG refused to fully cooperate in the IRS and Senate investigations and intentionally withheld evidence.  KPMG's conduct in those investigations was "characterized by obstinance and arrogance."

44.     Greenberg is informed and believes and thereon alleges that Ms. Taft initially intentionally attempted to deceive the IRS in its investigation of KPMG.

/ / /

45.     Greenberg is informed and believes and thereon alleges that, when Ms. Taft's attempts to deceive the IRS were revealed, Ms. Taft wrongfully attempted to conceal her actions.

46.     Greenberg is informed and believes and thereon alleges that Ms. Taft failed to deal honestly and forthrightly with the IRS during its investigation by parsing language and taking positions that relevant and discoverable information was subject to the attorney-client privilege or was not responsive.

47.     Greenberg is informed and believes and thereon alleges that, later in the IRS investigation, Ms. Taft falsely claimed that she had no knowledge of information that had been withheld from the IRS, notwithstanding her affirmative previous actions to conceal such information from the IRS.

48.     KPMG's actions during the IRS investigation came back to haunt it. In early February, 2004, the investigation was referred by the IRS to the Department of Justice ("DOJ") and was then presented to the Grand Jury for the Southern District of New York.

49.     On February 18, 2004, KPMG Chief Executive Officer Eugene O'Kelly sent a memo to all partners assuring them that any "present or former members of the firm asked to appear [in connection with the DOJ investigation] will be represented by competent counsel at the firm's expense."

50.     Mr. O'Kelly's memo was written affirmation of KPMG's long-standing and unbroken general policy and long standing practice to pay the legal fees of its current and former employees and partners who incurred legal fees and costs for acts and omissions–in both civil and criminal cases–that arose from or was related to their employment with KPMG.

/ / /

/ / /

51.     In early 2004, when it became apparent to KPMG that the DOJ was moving toward criminally indicting the firm for tax fraud related offenses, KPMG suddenly reversed position.

52.     KPMG was aware that the earlier indictment of the accounting firm Arthur Andersen LLP resulted in the complete destruction and closure of that firm.

53.     Three-quarters of KPMG's practice consists of highly lucrative audit work.  KPMG knew that a criminal indictment would result in the loss of a very substantial portion of that profitable audit work.

54.     Greenberg is informed and believes and thereon alleges that KPMG believed that a criminal indictment of KPMG would have caused its largest audit clients, including Citibank, Fannie May, New Century, RGI, the United States Treasury Department, the DOJ, the Federal Reserve, Occidental Petroleum, Ryder International, AIG, Goldman Sachs and its mutual funds, Berkshire Hathaway, Bank of America, Worldcom, IBM, Apple, Disney, Pixar, Washington Mutual, and Countrywide Financial, to cease using KPMG as its auditor and/or tax advisor. Greenberg is informed and believes and thereon alleges that those audit clients will testify in this action that they would have ceased using KPMG as its auditor and/or tax advisor if KPMG had been criminally indicted.

55.     KPMG knew that a loss of its audit work due to an indictment would destroy KPMG and realized that its very survival was at stake.  No major financial services firm had ever survived a criminal indictment.

56.     Greenberg is informed and believes and thereon alleges that KPMG also sought to bring the investigation to a halt before the scope and nature of all of the abusive tax products that KPMG had devised and marketed were fully disclosed.

/ / /

57.     Greenberg is informed and believes and thereon alleges that KPMG knew that the disclosure of the scope and nature of all of the fraudulent corporate tax products KPMG had devised and sold would also result in the imposition of massive fines and penalties and criminal indictment of the firm.

58.     An example of some of the numerous tax products that KPMG marketed, with which Greenberg had no involvement, included:

A.      "Tier 1 Capital", which allows banks to obtain deductions when raising capital using offshore tax haven Financial Asset Securitization Investment Trusts ("FASIT");

B.      "TITUS", which allows banks to create fraudulent income through the decrease of book tax rate;

C.      "German KG Financing Structure", which allows corporations to avoid taxes in the U.S. and Germany;

D.      "Verdi I", which is the use of offshore tax haven FASITS to avoid taxes;

E.      "Default Captive Insurance", which creates phantom tax deductions for banks on their credit card receivables through the use of offshore tax haven subsidiaries";

F.      "21% LIFECO Solution", which is the use of reinsurance contracts by banks to create phantom tax deductions;

G.      "Price", which is the use of offshore tax haven insurance companies by executives to avoid taxes on corporate compensation;

H.      "RIPSS2", which is the use of foreign party and debt securitization to avoid taxes;

I.      "CARTELS", which is an international 304 non-economic loss generating transaction;

1          J.      "Repatriation of Foreign Parents Profits", which avoids U.S.

2 taxes on distributions through triangular B Reorgs;

3          K.      "Securities Lending Transaction", which allows banks to avoid

4 U.S. taxes by creating phantom FSI;

5          L.      "Partnership Buy in Strategy", which allows U.S. corporations

6 to avoid taxes on transfers of property to foreign tax havens;

7          M.      "LUX CO", which utilizes a branch in the U.S. of a

8 Luxembourg tax haven company to avoid taxes in the U.S.;

9          N.      "Interest Allocation Coop", which allows corporations to avoid

10 taxes in the U.S. and other countries;

11          O.      "Spared Sparing", which provides for the avoidance of

12 withholding taxes;

13          P.      "Original Issue Discount Strategy", which allows for taking the

14 same interest deduction twice;

15          Q.      "956/1032 Zero Basis Solution", which avoids U.S. taxes on

16 the repatriation of untaxed foreign profits;

17          R.      "Chase Knights", which is the use of a Luxembourg tax haven

18 to avoid us taxes;

19          S.      "Chase Squires", which is the use of a Luxembourg finance

20 subsidiary to avoid us taxes;

21          T.      "RBS", which is the use of repossessions by banks to avoid

22 taxes;

23          U.      "Caesar", which allows banks to fraudulently raise regulatory

24 capital and investors to avoid taxation by intentionally structuring transaction to

25 lack earnings and profits;

26 / / /

1     V.  "Global Currency Management Program", which allows banks

2 to invest in sophisticated foreign currency positions which generate substantial

3 non-economic tax losses;

4     W.  "SOCS", which is an artificial loss generator for banks;

5     X.  "Contingent Liability Trusts", which create artificial phantom

6 losses for corporations;

7     Y.  "Foreign Tax Haven Captive Insurance Companies", which

8 create artificial phantom losses for corporations;

9     Z.  "Tempest", which creates artificial phantom losses for banks;

10     AA. "Contingent Liability Corporations", which create artificial

11 phantom losses for corporations;

12     BB. "REIT Strategy", which eliminates income for banks;

13     CC. "Compensation Partnerships", which shifts income from

14 corporation to employees to avoid taxes;

15     DD. "Guaranteed Payments", which is the use of guaranteed

16 payments to avoid taxes;

17     EE. "BIG", which allows corporations to sell assets and avoid taxes;

18

19     FF. "Hamlet", which is the fraudulent use of banking rules to avoid

20 taxes resulting from interest expense allocable to tax exempt securities;

21     GG. "Loss Planning", which involves using IRC § 704d to avoid

22 taxes;

23     HH. "Debt Buy Back with Quasi Related Party", which allows for

24 the avoidance of taxes by a corporation on the buy back of discounted debt;

25     II.  "AARTS", which is the use of inter-company tax rules to avoid

26 taxes on the transfer of assets;

1    JJ.    "Nine Lives", which is the use of options to avoid gain

2 provisions of 355;

3    KK.   "RAPS", which is the use of accounting periods and REITS to

4 avoid taxes;

5    LL.    "CAPPS", which allows taxpayers to avoid tax by converting

6 ordinary income into capital under 306;

7    MM.  "B-Flip", which is the use of foreign companies to generate

8 non-economic tax losses;

9    NN.   "351 Leaseback", which is a strategy to avoid taxes on

10 contribution to corporations;

11    OO.   "SZCBS", which uses synthetic debt to avoid taxes;

12    PP.    "Stock Option Swap", which is a securities transaction using

13 options to not only avoid taxes, but to avoid Securities and Exchange Commission

14 Rules related to insider trading;

15    QQ.   "Project Zodiac", which allows for capital raising and creation

16 of phantom losses to avoid taxes all at the same time;

17    RR.   "Oilco", which allows oil companies to raise capital and avoid

18 taxes through the manipulation of basis rules on depleted properties;

19    SS.    "Debt Repurchase Program", which allows corporations to

20 avoid taxes on buy back of discounted debt;

21    TT.    "PARTS", which allows for the issuance of debt and avoidance

22 of taxes;

23    UU.   "FAS 140", which allows banks to avoid taxes through the

24 manipulation of accounting rules;

25    VV.   "Common Trust Fund Strategy", which avoids taxes through

26 the manipulation of common trust fund tax rules;

1        WW.  "MACES", which allows individuals to avoid taxes on ordinary

2    income property;

3        XX.   "CODA", which avoids the recognition of income on debt buy

4    backs;

5        YY.    "FADS", which creates artificial tax deductions through the

6    use of swaps;

7        ZZ.    "Express", which is the use of foreign parties to avoid taxes

8    through the securitization of receivables;

9        AAA.        "Stars", which is the use of a U.K. company to avoid

10   taxes in the U.K. and U.S.;

11       BBB.        "Short Lease", which avoids depreciation rules;

12       CCC.        "Slots", which creates tax deductions with leases that are

13   otherwise unavailable;

14       DDD.        "Employee Benefit Captive Insurance Company", which

15   creates otherwise unavailable tax deductions for potential employee costs through

16   the use of off shore tax haven companies; and

17       EEE.        "PINSCO", which is the use of offshore tax haven

18   insurance companies to avoid tax on the sale of assets.

19       59.    Greenberg is informed and believes and thereon alleges that KPMG

20   intentionally concealed its abusive corporate tax shelter work from the IRS and

21   DOJ.

22   / / /

23   / / /

24

25

26

60.     Greenberg is informed and believes and thereon alleges that KPMG also had many other fraudulent purported "income/estate planning strategies" for individuals, which not only eliminated current income tax, but also future estate taxes, and that the nature and extent of these strategies were likewise never disclosed to the IRS or DOJ.  These strategies relied on the fraudulent use of charitable remainder trusts and charade "charities" to evade the payment of taxes.

61.     Greenberg is informed and believes and thereon alleges that, in addition to its extensive involvement in abusive federal tax shelters, KPMG also promoted abusive state tax shelters to many banks and other entities in California, which completely eliminated their state tax obligations and has greatly contributed to California's current fiscal difficulties.

62.     Greenberg is informed and believes and thereon alleges that KPMG also failed to disclose to the IRS and DOJ that it systematically and concurrently engaged in multiple state tax minimization strategies involving multiple states, which involved perpetrating fraudulent acts across state borders.

63.     Greenberg is informed and believes and thereon alleges that KPMG also sought to halt the DOJ investigation in an effort to prevent the investigation and disclosure of the continuing audit fraud in which it was engaged, and which continues to this day.

64.     Greenberg is informed and believes and thereon alleges that KPMG was complicit in obscuring the true financial condition of companies and governmental agencies by approving off balance sheet transactions to conceal bad debts and by approving accounting practices that did not result in a an accurate representation of the clients' finances.

65.     Some of KPMG's wrongful audit practices have already come to light:

1          A.      In 2002, the Securities and Exchange Commission censured

2   KPMG for making investments in a money-market fund for which KPMG was

3   supposedly serving as an "independent" auditor.

4          B.      In 2002, KPMG's license to practice in the State of California

5   was suspended by the California Board of Accountancy ("CBA"), which

6   suspension was stayed and one year of probation was imposed, for KPMG's role in

7   the governmental bankruptcy of the County of Orange.  KPMG had audited the

8   County's financial statements in 1992 and 1993.  The CBA disciplined KPMG

9   "for failure to exercise due professional care and for gross negligence in

10  committing extreme departures from generally accepted auditing standards

11  (GAAS) and generally accepted government auditing standards (GAGAS),

12  including several of the 10 general auditing, field work, and reporting standards."

13         C.      In 2003, the Public Company Accounting Oversight Board

14  ("PCAOB") "identified significant audit and accounting issues that were missed by

15  [KPMG], and identified concerns about significant aspects of [KPMG's] quality

16  controls systems."  The PCAOB found that KPMG improperly conducted audits by

17  improperly permitting certain loan losses, questionable revenue recognition tactics,

18  write-downs associated with long-lived assets, goodwill in a business combination,

19  and others.  In some cases, PCAOB inspectors found that KPMG improperly failed

20  to test claims, data, or assumptions, while in others inspectors say auditors failed to

21  document their conclusions adequately.

22         D.      In 2003, KPMG agreed to pay $125 million to settle a class-

23  action lawsuit stemming from the audit deficiencies of KPMG's audit of the drug

24  chain Rite Aid Corp., in which KPMG's audit failed to reveal that the retailer had

25  overstated profits by $1.6 billion.

26  / / /

1          E.      In 2004, KPMG agreed to pay $115 million to settle lawsuits

2 stemming from the collapse of software company Lernout & Hauspie Speech

3 Products, in which KPMG's audit failed to reveal that Lernout & Hauspie had

4 fabricated 70% of its sales.

5          F.      In 2005, KPMG's license to practice accounting in the State of

6 California was again suspended by the CBA, which suspension was stayed and

7 three years of probation was imposed.  KPMG was the auditor for Gemstar-TV

8 Guide International, Inc. from 1993 until October 30, 2002, when Gemstar

9 terminated KPMG as its independent accountants.  The CBA, following similar

10 findings by the Securities and Exchange Commission, found "repeated audit

11 failures in connection with KPMG's audits of Gemstar's 15 (Gemstar-TV Guide

12 International, Inc.) financial statements."  "KPMG and its auditors committed

13 improper professional conduct (repeated instances of unreasonable conduct) in

14 violation of the Commission's Rule 102(e)(1)(iii)(B)(2), in that they acted

15 unreasonably in failing to require Gemstar to comply with GAAP, and in failing to

16 comply with GAAS during their audits and reviews of Gemstar's financial

17 statements."  This was not a isolated situation.  "[T]he misconduct spanned several

18 audit reports and reviews."  KPMG paid a settlement of $10 million to affected

19 Gemstar shareholders.

20          G.      In 2006, Fannie Mae sued KPMG, alleging that its former

21 auditor "approved years of financial statements that were riddled with errors."

22 Fannie Mae alleged that KPMG's failures led to one of the biggest accounting

23 restatements in history, involving "virtually every key accounting policy" affecting

24 its business.  "KPMG often did nothing more than rubber-stamp Fannie's internal

25 accounting decisions, in defiance of KPMG's professional obligations and the very

26 purpose for which it was hired."

1      H.     In March 2008, KPMG was accused of enabling "improper and

2    imprudent practices" at New Century Financial, a failed mortgage company.

3      I.     Also in 2008, KPMG agreed to pay $80 million to settle suits

4    from Xerox shareholders over manipulated earnings reports.

5      66.    Greenberg is informed and believes and thereon alleges that KPMG's

6    improper audit practices have played a substantial role in the current world-wide

7    economic crises.

8      67.    Greenberg is informed and believes and thereon alleges that, in an

9    effort to satiate the DOJ and save itself from further investigation of its tax shelter

10   activities and audit work, and in order to save itself from a criminal indictment,

11   KPMG made the deliberate decision to instead offer-up and sacrifice a number of

12   its current and former partners, including Greenberg.

13     68.    Greenberg is informed and believes and thereon alleges that KPMG

14   made the decision to do whatever was necessary, and whatever the DOJ demanded,

15   regardless of the truth of the matter and regardless of the effects on KPMG's

16   current and former partners, including Greenberg, to halt the DOJ investigation of

17   its tax shelter work and to ward off an indictment.

18     69.    In KPMG's effort to satiate the DOJ and avoid further investigation of

19   its activities, even though tax avoidance work and a tax avoidance mentality

20   permeated every level of KPMG, and even thought the tax avoidance work had

21   been vetted and condoned at the very highest levels of KPMG management,

22   KPMG sought to minimize the firm-wide role in tax avoidance and essentially

23   falsely represented to the DOJ that the tax strategies that had been marketed and

24   sold were essentially the work of a rogue group of employees and had been

25   concealed from, and was unknown to, KPMG management.

26   / / /

70.    As part of its efforts to appease the DOJ, KPMG did not just state that it would cooperate with the DOJ in its investigation.  Instead, KPMG agreed to work hand-in-hand with the government and specifically represented to the DOJ that it would actively assist the DOJ in obtaining indictments of current and former KPMG partners, including Greenberg.

71.    KPMG agreed to the DOJ's demand that KPMG not advance attorneys' fees to any indicted partners, even though it was KPMG's general policy and long standing practice, without exception, to pay the legal fees of its current and former employees and partners who incurred legal fees and costs for acts and omissions that arose from or was related to their employment with KPMG.

72.    KPMG had ordered its employees, which included its "partners", to cooperate in its purported internal investigation of its tax shelter work by speaking freely with KPMG's attorneys.  KPMG informed its employees that if they did not fully cooperate in the investigation, it would cease paying their legal fees.  Although those communications by KPMG employees with KPMG's attorneys were privileged, KPMG unilaterally waived that privilege and released all privileged statements by KPMG employees to the DOJ.

73.    Greenberg is informed and believes and thereon alleges that, in its effort to appease the DOJ, KPMG made false representations of material facts to the DOJ, and made other statements to the DOJ recklessly without knowledge if they were true or not.

74.    KPMG falsely represented to the DOJ that:

"Greenberg had taken fraudulent steps to conceal tax shelter transactions from the IRS by purporting to have the high net worth individual clients engage a law firm to provide legal advice, which law firm would then purport to engage KPMG to work under the direction of the law firm.

1      Although under *United States v. Kovel*, communications by non-lawyer

2      professionals such as accountants are protected under the attorney-client

3      privilege when the accountant is in fact working under the direction of

4      an attorney, numerous *Kovel* arrangements established by this former

5      partner were sham arrangements because the individuals did not directly

6      engage the law firm, in many instances never even spoke to the lawyers

7      whom they had purportedly engaged, and Greenberg's work was done

8      outside of the purported lawyer-client privilege.  The purpose of this

9      improper conduct was to enable the high net worth individual client, with

10     the assistance of Greenberg, to conceal the fraudulent tax shelter from

11     the IRS by attempting to cloak all of the work for the shelter in the

12     attorney-client privilege. This abuse of the attorney-client privilege was

13     used by Greenberg to circumvent KPMG's internal controls, and to

14     prevent others at KPMG from having full access to documents relating

15     to Greenberg's fraudulent activities."

16     75.    The truth was that each of the clients actually did engage the law firm

17 with written legal services agreements, had direct communications with the law

18 firm, paid attorneys' fees to the law firm, and the law firm provided legal services

19 for each of the clients.

20     76.    KPMG falsely represented to the DOJ that Greenberg had concealed

21 from KPMG clients for which Greenberg was performing tax shelter work.

22     77.    The truth was that Greenberg's actions were well known to his

23 supervisors at KPMG.  In March of 2000, one of Greenberg's supervisors ensured

24 that all of Greenberg's client engagements were appropriately set in the KPMG

25 computer system so:  a) KPMG could track revenue by client; and b) every client

26 required a separate engagement or sequence number under KPMG DPP rules.  As a

result, every engagement of Greenberg's was set-up with a separate engagement number.  A review of Greenberg's engagement runs would reveal every client for which Greenberg performed work.  The same engagement run also lists the manager for each client so the KPMG manager above Greenberg had full access to the details of every one of Greenberg's engagements.

78.     Greenberg is informed and believes and thereon alleges that, at all times relevant herein, Dennis Malloy was employed as a partner of KPMG in its office located in Los Angeles, California.

79.     Greenberg is informed and believes and thereon alleges that, during the DOJ investigation, Mr. Malloy lied to the DOJ about Greenberg's activities, notwithstanding that Mr. Malloy had reviewed and approved most of those activities.  Mr. Malloy lied when he denied reviewing Greenberg's files; lied when he denied having substantial information in his own files regarding the client investment strategies in which Greenberg was involved; and lied when he claimed that Greenberg had concealed client files.

80.     Mr. Malloy had access to all of the files related to the transactions on which Greenberg had worked and also maintained his own files on the transactions.  Mr. Malloy knew that certain client files were maintained by Greenberg's secretary in a file cabinet adjacent to her work station as part of the normal course of business, yet Malloy falsely claimed that these client files had been concealed by Greenberg.

81.     Greenberg is informed and believes and thereon alleges that, at all times relevant herein, John Chopack was employed as a partner of KPMG in its office located in New York, New York.

82.     Greenberg is informed and believes and thereon alleges that, during the DOJ investigation of KPMG, Chopack misrepresented Greenberg's activities to

the DOJ by falsely claiming that Greenberg was involved with certain illegal tax shelters.  At the same time, Defendant Chopack concealed from the DOJ his own extensive involvement in abusive tax shelters that he had promoted to his own clients.

83.   Greenberg refused to issue a tax opinion for a client that was requested by Mr. Chopack while the KPMG investigation of Greenberg was underway in 2002.  Greenberg is informed and believes and thereon alleges that Mr. Chopack later told the DOJ that the transaction was an illegal tax shelter in which Greenberg had been involved.  Att the time, however, Mr. Chopack had authorized the issuance of a tax opinion by another KPMG partner when Greenberg refused to do so.

84.   Greenberg is informed and believes and thereon alleges that, at all times relevant herein, Mark Ely was employed as a partner of KPMG in its office located in Washington D.C.

85.   Greenberg is informed and believes and thereon alleges that, during the DOJ investigation of KPMG, Mr. Ely lied to the DOJ and the Grand Jury when describing tax shelter registration requirements and concealed his involvement in the determination that KPMG tax shelter transactions did not need to be registered.

86.   Greenberg is informed and believes and thereon alleges that, at all times relevant herein, Erin Collins was employed as a partner of KPMG in its office located in Los Angeles, California.

87.   Greenberg is informed and believes and thereon alleges that Ms. Collins lied to the DOJ about Greenberg to conceal her extensive involvement in helping a taxpayer obtain hundreds of millions of dollars in BLIPs tax benefits and in an effort to appease the DOJ by appearing to be fully cooperating.

/ / /

88.     Greenberg is informed and believes and thereon alleges that Ms. Collins lied to the DOJ when she told the DOJ that she had little involvement with that BLIPs client, notwithstanding that she had charged hundreds of hours of time, and thousands of dollars of expenses, to that client; when she told the DOJ that Greenberg had purchased a property for less than fair market value in and effort to conceal the receipt of fees for tax strategy work; and when she told the DOJ that she had asked Greenberg to stay away from her clients when Greenberg had actually never had any contact with Ms. Collins.

89.     KPMG falsely represented to the DOJ that it did not learn of a client named Spilsbury for whom Greenberg performed tax strategy work until January of 2004 when Spilsbury sued KPMG.

90.     The truth is that KPMG very well knew of Greenberg's work for Spilsbury in 2002 from at least three different sources.  In the middle of 2002, KPMG DPP reviewed Greenberg's client files–including Spilsbury.  In November of 2002, an investigation by Gray Cary for KPMG included a review of the Spilsbury transaction.  In March of 2003, KPMG's lawyers, Willkie Farr, reviewed Greenberg's client files and specifically documented their review of the Spilsbury transaction.

91.     Greenberg is informed and believes and thereon alleges that, at all times relevant herein, Diane Fuller was employed as a partner of KPMG in its office located in New York, New York.

92.     Greenberg is informed and believes and thereon alleges that Ms. Fuller lied regarding the Spilsbury civil matter when she falsely testified under oath in a deposition that an e-mail was sent to Greenberg by upper management to not issue short option strategy ("SOS") opinion letters, notwithstanding the fact that Ms. Fuller herself led the charge at KPMG to promote the SOS tax shelter to

KPMG clients, including being the lead partner on forming formal alliances with two purported independent promoters of the SOS tax shelter.

93.     On March 18, 2005, Robert S. Bennett, the top Skadden Arps lawyer for KPMG, said during a meeting with the DOJ in negotiations over the content of a statement of facts that KPMG would memorialize that, "We did not know all the facts behind any possible wrongdoing because we did not conduct an internal investigation."

94.     Greenberg is informed and believes and thereon alleges that, at all times relevant herein, Joseph Loonan was employed by KPMG as a lawyer in its office located in New York, New York.

95.     On March 19, 2005, Mr. Loonan sent an e-mail message to Mr. Barloon, one of the Skadden Arps lawyers for KPMG, stating that the statement of facts that prosecutors wanted KPMG to use as its admission "is not of facts but of conclusions based on some facts, distortions of facts and adverse inferences."

96.     Mr. Loonan referred to the statement of facts that KPMG would later adopt as "false, misleading and unsupportable."  Adopting the words of a Kris Kristofferson song when acknowledging that KPMG must nevertheless adopt the statement of facts to save itself from indictment, Mr. Loonan wrote, "Freedom's just another word for nothing left to lose."

97.     In the Statement of Facts that KPMG would ultimately adopt, KPMG deliberately or recklessly made the following additional false statements:

        A.     "At least 14 partners engaged in SOS transactions for their own account", when the truth was that less than eight KPMG partners engaged in personal SOS transactions;

/ / /

/ / /

B.    The deductions taken for SOS transaction losses were "bogus tax losses", when the truth is that two SOS court cases decided on the merits have found that an SOS transaction can be valid from a tax perspective;

C.    Greenberg's opinion letters "misrepresented SOS as an investment", when the truth is that even the DOJ admitted that an investment component did exist for SOS and many of Greenberg's clients made substantial profits from their options investments.  Greenberg spent significant period of time devising and structuring trades for clients based on a method of trading called "high probability trading", which involves combining several facets of different trading disciplines to obtain a signal where several market indicators line up at once to provide the highest probability of success, e.g.:  stochastic volatility; asymmetrical market price to quoted option price (volatility smiles); Fibonacci support and retracement levels; the Elliot wave technique; various moving averages; various Bollinger bands; various MACD and Slow Stochastics; analysis of market fundamentals in several different jurisdictions impacting the price of currency; use of butterfly patterns; swing trading patterns; and analysis of geopolitical issues impacting rate movements.  As a result of such analysis, profits were realized on the majority of the trades Greenberg structured.  Many of the trades Greenberg structured became substantially profitable within the first 25% of the options expiration period, generating returns in excess of 3,600% (on an annualized basis).  Further, in every tax opinion drafted by Greenberg, he made it clear he assumed the IRS would treat the transaction as a tax shelter under Section 6662, which defines a tax shelter as any transaction which the IRS would treat as having a tax avoidance motive and little or no economic substance (as allowed

/ / /

/ / /

under the law at the time), but that based on the tax law at the time, it was Greenberg's opinion the transaction nevertheless had a more likely than not chance of surviving IRS challenge if fully litigated;

D.    The tax opinions falsely claim "the 'investor' would have entered into the option positions independent of the other steps that made up SOS", when the truth is that the SOS tax opinions issued by Greenberg never made any such representation;

E.    Following the investigation of Greenberg, "KPMG's Office of General Counsel determined that [Greenberg] had violated firm policies and recommended that the firm terminate him, but that recommendation was rejected in late 2002 by the Former Deputy Chairman and tax leadership", when the truth is that, even though 22 million pages of discovery were produced in connection with the DOJ investigation, not a single document reflects any such recommendation or that such a recommendation was presented to the Former Deputy Chairman or tax leadership and rejected; and

F.    SOS transactions were required to be registered with the IRS as tax shelters, when the truth is Mr. Ely prepared an internal KPMG memorandum stating that the law was clear under I.R.C. § 6111 that SOS was not required to be registered.

98.    Greenberg is informed and believes and thereon alleges that Mr. Bennett negotiated and KPMG, including the individuals on its Board of Directors and Management Committee, affirmed the content of the Statement of Facts, notwithstanding that they all knew the Statement of Facts contained material false statements, knew there was no factual basis for many of the material assertions that are set forth in the Statement, or affirmed the factual statements with no reasonable basis for knowing if the statements were or were not true.

99.     Based on KPMG's false and reckless statements and its agreement to cooperate with the DOJ going forward, on or about August 26, 2005, the United States Attorney's Office for the Southern District of New York and KPMG entered into a Deferred Prosecution Agreement ("DPA"), along with an accompanying Statement of Facts.

100.    KPMG consented to the filing of a one-count Information (which was subsequently dismissed upon KPMG's assumed compliance with the DPA).  This Information charged KPMG with participating in a conspiracy to defraud the United States and its agency the IRS to commit tax evasion, to make and subscribe false and fraudulent tax returns, and to aid and assist in the preparation and filing of said tax returns.

101.    Within the DPA and the associated Statement of Facts, KPMG accepted responsibility for violations of law.  KPMG admitted, through the conduct of certain KPMG tax leaders, partners, and employees, KPMG had assisted high net worth United States citizens to evade United States individual income taxes on billions of dollars in capital gain and ordinary income by developing, promoting and implementing unregistered and fraudulent tax shelters.

102.    As part of the DPA, KPMG agreed to pay a penalty to the United States of $456 million.

103.    In connection with entering into the DPA, in which KPMG admits that it had committed felony crimes, KPMG incredibly concurrently negotiated an agreement with the Treasury Department that KPMG would be retained as the auditor for the Treasury Department's twelve bureaus, which account for $6.9 trillion in assets and is KPMG's largest audit client.

104.    The importance of KPMG maintaining its position as the Treasury Department's auditor, which would demonstrate to other clients that KPMG could

still be trusted notwithstanding the DPA, is evidenced by Mr. Bennett's statement on behalf of KPMG to the DOJ that, if KPMG was allowed to keep all of its government audits, "We will do everything we can to help you indict these partners."

105.    Greenberg is informed and believes and thereon alleges that, at all times relevant herein, Timothy P. Flynn was the Chairman of KPMG and KPMG International in KPMG's offices located in New York, New York.

106.    Greenberg is informed and believes and thereon alleges that Mr. Flynn, Mr. Loonan, Ms. Taft, and Mr. Chopack instructed KPMG's attorneys at Skadden Arps, who were representing KPMG in connection with the DOJ investigation, to inform the DOJ that, as long as KPMG would not be indicted and would be allowed to retain its hundreds of government audits, KPMG would do everything possible to help the DOJ indict Greenberg, regardless of the true facts, which KPMG concealed from the DOJ.

107.    Greenberg is informed and believes and thereon alleges that, although KPMG admitted that it had assisted high net worth United States citizens to evade United States individual income taxes as part of the DPA, KPMG did not disclose the nature and extent of its abusive tax shelter work for corporations and other types of entities.

108.    On June 16, 2005, KPMG issued a written press release that certain of its partners had engaged in "unlawful conduct." That press release, combined with the other information that had been made public, made it clear that KPMG publicly accused Greenberg of committing crimes.

///

///

109.   Greenberg is informed and believes and thereon alleges that KPMG also provided the California Board of Accountancy with false information substantially similar to the information that it provided to the DOJ and that it affirmed in the Statement of Facts.

110.   As a result of the false information that KPMG provided to the California Board of Accountancy, that agency revoked Greenberg's CPA certificate, leaving Greenberg unable to work as a CPA.

111.   Greenberg is informed and believes and thereon alleges that, in doing the acts alleged in this complaint, Mr. Flynn, Mr. Loonan, Ms. Taft, Mr. Chopack, Mr. Malloy, Mr. Ely, Ms. Collins, Ms. Fuller, and Mr. Hamersley were each an agent, representative, employee, partner, joint venturer, and/or co-conspirator of KPMG and engaged in such acts for the benefit of, and with the knowledge, prior consent, instruction, approval, and/or subsequent ratification of KPMG.

112.   KPMG's promise to the DOJ to assist it in obtaining indictments of the KPMG partners was fulfilled.  As a result of the actions of KPMG, its Board of Directors, Management Committee, partners, and employees as set forth herein and as will be proven at trial, Greenberg was named on October 17, 2005, in a superseding indictment in the criminal case in the Southern District of New York entitled *United States v. Stein, et al.*, S1 05 Crim. 0888(LAK).  Greenberg was arrested and incarcerated the same day.

113.   The charges against Greenberg arose directly from the course and scope of his employment with KPMG.

/ / /

/ / /

114.   Prior to the events that occurred as set forth in this complaint, Greenberg had never been arrested, had never been convicted of any crime other than minor traffic infractions, had never been the subject any disciplinary action by the California State Board of Accountancy, and had never been accused of any improper conduct or investigated by any regulatory authority.

115.   Greenberg was incarcerated for five months in the Federal Detention Facility in New York City.

116.   For a man who had never been arrested before, Greenberg was repeatedly subjected to the indignity of being compelled to strip naked and submit to complete body and body cavity searches in the presence of other prisoners. Greenberg was forced to share a large cell with up to thirty other prisoners. Greenberg was subjected to physical assaults by other prisoners due to his Jewish ancestry and endured taunting by guards in the Prison because of his status as a Jewish white collar inmate.  Greenberg was forced to fight other prisoners to avoid being sexually assaulted.  Greenberg witnessed the sexual assault of other prisoners and deadly assaults between prisoners with make-shift weapons and felt continually threatened.  Greenberg was forced to live with the constant stench of vomit, compelled to consume food that he did not find suitable for animal consumption, and relieve himself of body wastes in full view of the other prisoners.

117.   When Greenberg was finally released on bail in April, 2006, after almost six months of confinement, he was placed on house arrest with a monitoring bracelet strapped to his ankle.  For the next 2-1/2 years, Greenberg was ordered to reside, at great expense, in the borough of Manhattan.  Greenberg continued to exist as a prisoner confined by Court Order to his residence, his lawyer's offices, or the courthouse.

118.   Following a trial by jury, on December 18, 2008, Greenberg was acquitted on all charges.

119.   As a result of the actions of KPMG as set forth herein and as will be proven at trial, Greenberg lost over three years of freedom and has suffered severe physical and emotional distress.

120.   As a result of the tax work that Greenberg performed while at KPMG, and as a result of KPMG admitting criminal liability in connection with the DPA, a number of civil actions have been filed by former clients of KPMG in which Greenberg has been named as a defendant.  KPMG has refused to defend Greenberg in those civil actions.

121.   Greenberg reasonably expected that KPMG would pay the attorneys' fees and costs that he incurred, in both criminal and civil actions, and would indemnify him from any civil judgment that was entered against him, which arose from or was related to the work that Greenberg performed at KPMG.

122.   In connection with negotiating the severance agreement between KPMG and Greenberg, Ms. Taft expressly stated in writing to KPMG's outside legal counsel that it was not necessary to address the potential reimbursement of legal fees issue in the severance agreement because KPMG would pay Greenberg's legal fees.

123.   In June, 2006, the judge overseeing the criminal case, the Honorable Lewis A. Kaplan, found that it had been the longstanding voluntary practice of KPMG to advance and pay legal fees, without a present cap or condition of cooperation with the government, for legal counsel for current and former partners, principals, and employees of the firm.

124.   Judge Kaplan further found that, on commencing employment with KPMG, the defendants acquired a legitimate expectation that their legal expenses

would be advanced should they get into trouble with the law as a result of their jobs.

125.    That contractual expectation found by Judge Kaplan was reinforced by the written assurance that KPMG CEO O'Kelly gave immediately after he became aware of the U.S. Attorney's investigation.

126.    Despite demands having been made, KPMG has failed and refused to reimburse Greenberg for the attorneys' fees and costs that he incurred in connection with the *Stein* criminal case in which he was exonerated or in the civil cases in which he has been named as a defendant.

127.    Greenberg is informed and believes and thereon alleges that, for each of the other defendants formerly employed by KPMG who were indicted in the *Stein* criminal case, but who were not convicted, KPMG has paid, or has agreed to pay, all or substantially all of the attorneys' fees and costs that they incurred in connection with the *Stein* criminal case.

128.    Greenberg is informed and believes and thereon alleges that he is the only defendant in the Stein criminal case who was formerly employed by KPMG, who was not convicted, but for whom KPMG has refused to pay any of the fees and costs that he incurred in connection with the *Stein* criminal case.

129.    Although no civil judgments have been entered against Greenberg to date based on the work that he performed at KPMG, KPMG has not agreed to indemnify Greenberg should any such judgment ultimately be entered.

/ / /

/ / /

**FIRST CLAIM FOR RELIEF**

(Indemnity under California Labor Code § 2802(a))

130.   Greenberg refers to paragraphs 1 through 129, inclusive, and incorporates those allegations herein by this reference.

131.   Under California law, Greenberg was an employee of KPMG and is protected by the provisions of the California Labor Code.

132.   At the time Greenberg engaged in the acts set forth herein in the course and scope of his employment with KPMG, he believed that all such acts were lawful.

133.   In the direct consequence of the discharge of his duties at KPMG, Greenberg has incurred attorneys' fees and costs in an amount subject to proof at the time of trial, but which, to date, exceed $10 million.

134.   Despite demands having been made, KPMG has to date failed and refused to reimburse Greenberg for the attorneys' fees and costs that he has incurred.


**SECOND CLAIM FOR RELIEF**

(Indemnity Under 6 Delaware Code § 15-401(c))

135.   Greenberg refers to paragraphs 1 through 129, inclusive, and incorporates those allegations herein by this reference.

136.   To the extent that Greenberg was a "partner" of KPMG under the laws of the State of Delaware where KPMG is organized, Greenberg has incurred attorneys' fees and costs in an amount subject to proof at the time of trial, but which, to date, exceed $10 million.

/ / /

/ / /

137.   The attorneys' fees and costs that Greenberg has incurred are liabilities incurred by Greenberg as a result of the ordinary course of the business of KPMG, or for the preservation of KPMG's business or property.

138.   Despite demands having been made, KPMG has to date failed and refused to reimburse Greenberg for the attorneys' fees and costs that he has incurred.

## THIRD CLAIM FOR RELIEF

(Indemnity Under 6 Delaware Code § 15-701(d))

139.   Greenberg refers to paragraphs 1 through 129, inclusive, and incorporates those allegations herein by this reference.

140.   To the extent that Greenberg was a "partner" of KPMG under the laws of the State of Delaware where KPMG is organized, Greenberg disassociated from the partnership in August of 2003.

141.   Greenberg has incurred attorneys' fees and costs in an amount subject to proof at the time of trial, but which, to date, exceed $10 million.

142.   The attorneys' fees and costs that Greenberg has incurred are a KPMG partnership obligation.

143.   Despite demands having been made, KPMG has to date failed and refused to reimburse Greenberg for the attorneys' fees and costs that he has incurred.

## FOURTH CLAIM FOR RELIEF

(Breach of Implied Contract for Indemnity)

144.   Greenberg refers to paragraphs 1 through 129, inclusive, and incorporates those allegations herein by this reference.

145.   At the time of commencing work with KPMG, Greenberg and KPMG entered into an employment contract pursuant to which it was implied by past conduct that KPMG would pay all attorneys' fees and costs that Greenberg incurred, in both criminal and civil actions, which arose from the work that Greenberg performed at KPMG.

146.   Greenberg has performed all of the material conditions of the employment agreement required of him, except those provisions that have been waived or excused.

147.   As a result of the failure and refusal of KPMG to reimburse Greenberg for the attorneys' fees and costs that he incurred in connection with the criminal case in which he was exonerated of charges arising from his employment with KPMG, or in the civil cases in which he has been named as a defendant, Greenberg has incurred attorneys' fees and costs in an amount subject to proof at the time of trial, but which, to date, exceed $10 million.

### FIFTH CLAIM FOR RELIEF

(Breach of the Covenant of Good Faith and Fair Dealing)

148.   Greenberg refers to paragraphs 1 through 129, inclusive, and incorporates those allegations herein by this reference.

149.   At the time of commencing work with KPMG, Greenberg and KPMG entered into an employment contract pursuant to which it was implied by the covenant of good faith and fair dealing that KPMG would pay all attorneys' fees and costs that Greenberg incurred, in both criminal and civil actions, which arose from the work that Greenberg performed at KPMG.

/ / /

/ / /

150.   Greenberg has performed all of the material conditions of the employment agreement required of him, except those provisions that have been waived or excused.

151.   As a result of the failure and refusal of KPMG to comply with its obligations to Greenberg under the implied promise of good faith and fair dealing to reimburse Greenberg for the attorneys' fees and costs that he incurred in connection with the criminal case in which he was exonerated of charges arising from his employment with KPMG, or in the civil cases in which he has been named as a defendant, Greenberg has incurred attorneys' fees and costs in an amount subject to proof at the time of trial, but which, to date, exceed $10 million.

## SIXTH CLAIM FOR RELIEF

(Breach of Fiduciary Duty)

152.   Greenberg refers to paragraphs 1 through 129, inclusive, and incorporates those allegations herein by this reference.

153.   To the extent that Greenberg was a "partner" of KPMG under the laws of the State of Delaware where KPMG is organized, Mr. Flynn, Mr. Loonan, Ms. Taft, Mr. Chopack, Mr. Malloy, Mr. Ely, Ms. Collins, and Ms. Fuller were Greenberg's partners and acted in concert with, and on behalf of, KPMG.

154.   As a result, KPMG, through Mr. Flynn, Mr. Loonan, Ms. Taft, Mr. Chopack, Mr. Malloy, Mr. Ely, Ms. Collins, and Ms. Fuller, owed Greenberg fiduciary duties of loyalty.

155.   KPMG, through Mr. Flynn, Mr. Loonan, Ms. Taft, Mr. Chopack, Mr. Malloy, Mr. Ely, Ms. Collins, and Ms. Fuller, breached its fiduciary duties to Greenberg by engaging in the acts and omissions set forth herein.

/ / /

156.   The acts and omissions of KPMG as set forth herein were a substantial factor in causing the damages suffered by Greenberg.

157.   As a result of the acts and omissions of KPMG as set forth herein, Greenberg has incurred damages in the form of attorneys' fees and costs in an amount subject to proof at the time of trial, but which, to date, exceed $10 million. Greenberg has also suffered from severe physical and emotional distress as a result of the acts and omissions of KPMG as set forth herein.

158.   Greenberg is informed and believes and thereon alleges that, in doing the acts alleged herein, KPMG acted in conscious and intentional disregard for Greenberg's rights and acted with oppression, fraud, and/or malice so as to entitle Greenberg to recover punitive and exemplary damages against KPMG in an amount deemed by the trier of fact to be sufficient to punish, deter, and make an example of KPMG.

**SEVENTH CLAIM FOR RELIEF**

(Malicious Prosecution)

159.   Greenberg refers to paragraphs 1 through 129, inclusive, and incorporates those allegations herein by this reference.

160.   Greenberg alleges that KPMG, by its acts and omissions as set forth herein, intentionally and wrongfully caused a criminal proceeding to be brought against Greenberg.

161.   Greenberg alleges that KPMG was actively involved in causing Greenberg to be prosecuted or in causing the continuation of the prosecution against him.

162.   The criminal proceeding ended in Greenberg's favor.

/ / /

163.   Greenberg alleges that no reasonable person in the same circumstances as KPMG would have believed that there were legitimate grounds for causing Greenberg to be indicted, arrested, and prosecuted.

164.   Greenberg alleges that KPMG acted primarily for a purpose other than to bring Greenberg to justice.

165.   As a result of the acts and omissions of KPMG as set forth herein, Greenberg has incurred damages in the form of attorneys' fees and costs in an amount subject to proof at the time of trial, but which, to date, exceed $10 million. Greenberg has also suffered from severe physical and emotional distress as a result of the acts and omissions of KPMG as set forth herein.

166.   Greenberg is informed and believes and thereon alleges that, in doing the acts alleged herein, KPMG acted in conscious and intentional disregard for Greenberg's rights and acted with oppression, fraud, and/or malice so as to entitle Greenberg to recover punitive and exemplary damages against KPMG in an amount deemed by the trier of fact to be sufficient to punish, deter, and make an example of KPMG.

**EIGHTH CLAIM FOR RELIEF**

(Defamation)

167.   Greenberg refers to paragraphs 1 through 129, inclusive, and incorporates those allegations herein by this reference.

168.   KPMG publicly made the statements set forth herein factually asserting that Greenberg had engaged in criminal conduct.

169.   The public reasonably understood that KPMG's statements were about Greenberg.

170.   KPMG's statements about Greenberg were not privileged.

171.   KPMG knew that the statements set forth herein concerning Greenberg were false, or KPMG failed to use reasonable care to determine the truth or falsity of the statement(s).

172.   As a result of the acts and omissions of KPMG as set forth herein, Greenberg has incurred damages in the form of attorneys' fees and costs in an amount subject to proof at the time of trial, but which, to date, exceed $10 million. Greenberg has also suffered harm to his profession and reputation, and suffers from severe physical and emotional distress as a result of the acts and omissions of KPMG.

173.   Greenberg is informed and believes and thereon alleges that, in doing the acts alleged herein, KPMG acted in conscious and intentional disregard for Greenberg's rights and acted with oppression, fraud, and/or malice so as to entitle Greenberg to recover punitive and exemplary damages against KPMG in an amount deemed by the trier of fact to be sufficient to punish, deter, and make an example of KPMG.

## NINTH CLAIM FOR RELIEF

(Intentional Infliction of Emotional Distress)

174.   Greenberg refers to paragraphs 1 through 129, inclusive, and incorporates those allegations herein by this reference.

175.   Greenberg is informed and believes and thereon alleges that KPMG intended to cause severe physical and emotional distress to Greenberg, or acted in reckless disregard in causing severe physical and emotional distress to Greenberg.

176.   The acts and omissions of KPMG as set forth herein were outrageous and went far beyond the bounds of human decency.

/ / /

177.   Greenberg suffered severe physical and emotional distress as a result of the acts and omissions of KPMG.

178.   As a result of the acts and omissions of KPMG as set forth herein, Greenberg has incurred damages in the form of attorneys' fees and costs in an amount subject to proof at the time of trial, but which, to date, exceed $10 million. Greenberg has also suffered from severe physical and emotional distress as a result of the acts and omissions of KPMG as set forth herein.

179.   Greenberg is informed and believes and thereon alleges that, in doing the acts alleged herein, KPMG acted in conscious and intentional disregard for Greenberg's rights and acted with oppression, fraud, and/or malice so as to entitle Greenberg to recover punitive and exemplary damages against KPMG in an amount deemed by the trier of fact to be sufficient to punish, deter, and make an example of KPMG.

**TENTH CLAIM FOR RELIEF**

(Fraud)

180.   Greenberg refers to paragraphs 1 through 129, inclusive, and incorporates those allegations herein by this reference.

181.   To the extent that Greenberg was a "partner" of KPMG under the laws of the State of Delaware where KPMG is organized, Mr. Flynn, Mr. Loonan, Ms. Taft, Mr. Chopack, Mr. Malloy, Mr. Ely, Ms. Collins, and Ms. Fuller were Greenberg's partners and acted in concert through the KPMG partnership.

182.   As a result, KPMG owed Greenberg fiduciary duties of loyalty.

183.   KPMG concealed and failed to inform Greenberg of material facts as set forth herein.

/ / /

184.   Greenberg had no independent knowledge of the facts that had been concealed from him.

185.   The omissions of KPMG as set forth herein were intended to, and did, deceive Greenberg.

186.   Greenberg justifiably relied on the deception of KPMG.

187.   The omissions of KPMG as set forth herein were a substantial factor in causing the damages suffered by Greenberg.

188.   As a result of the omissions of KPMG as set forth herein, Greenberg has incurred damages in the form of attorneys' fees and costs in an amount subject to proof at the time of trial, but which, to date, exceed $10 million.  Greenberg has also suffered from severe physical and emotional distress as a result of the omissions of KPMG as set forth herein.

189.   Greenberg is informed and believes and thereon alleges that KPMG acted in conscious and intentional disregard for Greenberg's rights and acted with oppression, fraud, and/or malice so as to entitle Greenberg to recover punitive and exemplary damages against KPMG in an amount deemed by the trier of fact to be sufficient to punish, deter, and make an example of KPMG.

## ELEVENTH CLAIM FOR RELIEF

(Declaratory Relief)

190.   Greenberg refers to paragraphs 1 through 129, inclusive, and incorporates those allegations herein by this reference.

### COUNT ONE

191.   A number of civil lawsuits have been filed against Greenberg arising from the tax work in which Greenberg was involved while employed by KPMG.

/ / /

192.   Greenberg has been threatened with additional civil lawsuits that have not yet been filed arising from the tax work in which Greenberg was involved while employed by KPMG.

193.   The civil lawsuits arose from the ordinary course of Greenberg's employment with KPMG.

194.   Greenberg contends that KPMG is obligated to indemnify and/or defend Greenberg for the attorneys' fees, costs, and any damages that might be awarded against Greenberg in the civil lawsuits.

195.   Greenberg is informed and believes and thereon alleges that KPMG contends that it is not obligated to indemnify and/or defend Greenberg for the attorneys' fees, costs, and any damages that might be awarded against Greenberg in the civil lawsuits.

196.   An actual controversy therefore exists between Greenberg, on the one hand, and KPMG, on the other hand, with respect to the liabilities, rights, duties, and obligations of the parties going forward.

197.   Greenberg therefore desires and seeks a judicial determination as to rights and duties of the parties.  Such declaration is necessary and appropriate at this time in order that the parties may ascertain their respective future rights and duties.

<u>COUNT TWO</u>

198.   Greenberg contends that, notwithstanding the title of "Partner" that was assigned to him by KPMG, Greenberg was in fact an "employee" under California law.  As an employee, and as to all other similarly situated "Partners" who are employed in the State of California, KPMG was and is obligated to pay such employees' workman's compensation premiums and the employer's half of

federal social security payments, Medicare payments, and California state disability insurance payments.  Moreover, as an employee, Greenberg is entitled to the protections afforded employees by the California Labor Code, including, *inter alia*, the right to reimbursement for expenditures made arising from or related to his former employment with KPMG.

199.   Greenberg is informed and believes and thereon alleges that KPMG contends that Greenberg was, and similarly situated partners who are employed in the State of California are, in fact partners of KPMG and not "employees" under California law and that KPMG was and is not obligated to pay such partners' workman's compensation premiums and the employer's half of federal social security payments, Medicare payments, and California state disability insurance payments.  Moreover, Greenberg is informed and believes and thereon alleges that KPMG contends that Greenberg is not entitled to the protections afforded employees by the California Labor Code, including, *inter alia*, the right to reimbursement for expenditures made arising from or related to Greenberg's former employment with KPMG.

200.   Greenberg paid the employer's portion of the federal social security payments, Medicare payments, and California state disability insurance payments, and has expended monies on attorneys' fees and costs for claims made related to or arising from his employment with KPMG.

201.   An actual controversy therefore exists between Greenberg, on the one hand, and KPMG, on the other hand, with respect to the liabilities, rights, duties, and obligations of the parties regarding financial responsibility for those payments.

202.   Greenberg therefore desires and seeks a judicial determination as to rights and duties of the parties.  Such declaration is necessary and appropriate at this time in order that the parties may ascertain their respective rights and duties.

## PRAYER FOR RELIEF

WHEREFORE, Greenberg prays for judgment against KPMG as follows:

### On the First Claim for Relief

1. For reimbursement of the attorneys's fees and costs incurred by Greenberg in defending himself in the criminal action and in the civil actions, which sum shall be subject to proof at the time of trial, but which is an amount in excess of $10,000,000.00;

2. For statutory reimbursement of the attorneys' fees incurred by Greenberg in prosecuting this claim for relief;

### On the Second through Fifth Claims for Relief

3. For reimbursement of the attorneys's fees and costs incurred by Greenberg in defending himself in the Criminal action and in the civil actions, which sum shall be subject to proof at the time of trial, but which is an amount in excess of $10,000,000.00;

### On the Sixth through Tenth Claims for Relief

4. For reimbursement of the attorneys's fees and costs incurred by Greenberg in defending himself in the criminal action and in the civil actions, which sum shall be subject to proof at the time of trial, but which is an amount in excess of $10,000,000.00;

5. For pain, suffering, and severe physical and emotional distress;

6. For lost wages and income, and for future lost earnings potential, which sum shall be subject to proof at the time of trial, but which is an amount in excess of $20,000,000.00;

7. For punitive and exemplary damages in an amount deemed by the trier of fact to be sufficient to punish, deter, and make an example of Defendant;

/ / /

On the First through Tenth Claims for Relief

8.      For pre-judgment interest at the maximum rate permitted by law on all liquidated damages;

On the Eleventh Claim for Relief

9.      For a judicial declaration of the rights and duties of Greenberg and KPMG;

On All Claims for Relief

10.     For costs of suit incurred herein; and

11.     For such other and further relief as the Court may deem just and proper.

DATED: July 17, 2009                      LGI LLP
                                          LAWYERS GROUP INTERNATIONAL


                                          By _____
                                             Bradley A. Patterson
                                             Attorneys for Plaintiff David B. Greenberg

1

## **DEMAND FOR TRIAL BY JURY**

2        Plaintiff David B. Greenberg requests a trial by jury on all legal claims

3  asserted in this action.

4

5  DATED: July 17, 2009                LGI LLP
                                      LAWYERS GROUP INTERNATIONAL

6

7                             By _____

8                                Bradley A. Patterson
                                Attorneys for Plaintiff David B. Greenberg

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## CERTIFICATION OF INTERESTED PARTIES

(Civil L.R. 7-1.1)

The undersigned, counsel of record for Plaintiff David B. Greenberg in this action, certifies that the following listed party (or parties) may have a pecuniary interest in the outcome of this case.  These representations are made to enable the Court to evaluate possible disqualification or recusal.

Plaintiff is not presently aware of the identity of any persons or entities subject to disclosure under this rule.

DATED: July 17, 2009

LGI LLP
LAWYERS GROUP INTERNATIONAL

By _____
     Bradley A. Patterson
     Attorneys for Plaintiff David B. Greenberg

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Ronald S. W. Lew and the assigned discovery Magistrate Judge is Rosalyn M. Chapman.

The case number on all documents filed with the Court should read as follows:

## CV09- 5273 RSWL (RCx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

═══════════════════════════════════════════════════════

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
Bradley A. Patterson, Esq. (Cal. Bar No. 155482)
LGI LLP
18101 Von Karman Ave., Suite 330
Irvine, CA 92612-0146
Telephone: (949) 253-0500; Fax: (949) 253-0505

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID B. GREENBERG,<br>an individual,<br><br>PLAINTIFF(S)<br>v.<br><br>KPMG LLP,<br>a Delaware limited liability partnership,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**CV09-5273 RSWL(RCX)**<br><br><br><br>**SUMMONS** |

TO:  DEFENDANT(S): _KPMG LLP, a Delaware limited liability partnership,_


A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _____Bradley A. Patterson, Esq._____, whose address is _LGI LLP; 18101 Von Karman Ave., Ste. 330; Irvine, CA 92612-0146_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ____JUL 2 0 2009____

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| DAVID B. GREENBERG, an individual | KPMG LLP, a Delaware limited liability partnership |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Bradley A. Patterson  (949.253.0500; 949.253.0505 (Fax)) <br> LGI LLP; 18101 Von Karman Ave., Suite 330; Irvine, CA 92612 | Richard Marmaro; Skadden, Arps, Slate, Meagher & Flom LLP <br> 300 South Grand Ave., Suite 3400; Los Angeles, CA 90071 <br> (213.687.5480; 213.621.5480 (Fax)) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:**  JURY DEMAND: ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

CLASS ACTION under F.R.C.P. 23: ☐ Yes  ☑ No    ☑ MONEY DEMANDED IN COMPLAINT: $ >$10,000,000.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. § 1332(a); Former employee seeks reimbursement of expenses incurred arising from employment and damages based on actions of former employer

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☑ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE/ PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **IMMIGRATION** | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

FOR OFFICE USE ONLY:  Case Number: _____  **CV09-5273 RSWL(RCX)**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                            ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                            ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                            ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| N/A | Florida |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Defendant is a Big 4 accounting firm and conducts extensive business operations in virtually every county in this Judicial District. | Defendant is organized and existing under the laws of the State of Delaware with its principal place of business in the City of New York, State of New York. |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County, California | N/A |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _J.C. Vottuan_     Date _July 17, 2009_

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |